UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Patricia Lee Gaudette,

        Plaintiff,

        v.                        Civil Action No. 5:14-cv-70-cr-jmc

Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
(Docs. 14, 19)

Plaintiff Patricia Lee Gaudette, proceeding *pro se*, brings this action pursuant to

42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the

decision of the Commissioner of Social Security ("Commissioner") denying her

application for disability insurance benefits ("DIB") and supplemental security income

("SSI").  Pending before the court are Gaudette's motion to reverse the Commissioner's

decision (Doc. 14), and the Commissioner's motion to affirm the same (Doc. 19).  For the

reasons stated below, I recommend that Gaudette's motion be DENIED, the

Commissioner's motion be GRANTED, and the decision of the Commissioner be

AFFIRMED.

## Background

At the time of the administrative hearing, Gaudette was 60 years old.  (AR 45.)

She left high school after the 11th grade and has worked as a donut maker, store laborer,

commercial cleaner, hand packager, specialty cook, and waitress.  (AR 72−73.)  Gaudette

stopped working as a donut maker on December 20, 2010, when her employer "refused to give [her] more hours to work."  (AR 260.)  Gaudette testified at the hearing that she has tried to look for work since June 2011, the beginning of the alleged disability period, but has been unsuccessful because of "the car situation and everything like that" and because of "[her] disabilities in [her] hips and . . . knees."  (AR 51.)

Gaudette alleges that scoliosis, migraine headaches, and osteoarthritis prevent her from working.  (AR 260.)  She also has received medical treatment for diabetes mellitus, asthma, depression, gastrointestinal reflux, an infection of her finger, and acute respiratory ailments.  Gaudette testified that she has scoliosis and arthritis in her hips and arthritis in her knees and ankles.  (AR 52.)  She does not use assistive devices, such as a brace or cane.  (AR 57−58.)  She regularly is prescribed pain medications, but she testified that she had not taken any for the month and a half prior to the hearing because she could not afford them.  (AR 53−54.)  She testified that over-the-counter medications do not work for her, and that she is "allergic to aspirin."  (AR 58.)

Gaudette testified that problems with both of her hips have existed "for a long time" and she experiences symptoms "[j]ust about all the time."  (AR 52.)  She testified that she experiences pain in her back every day.  (AR 53.)  She testified that she can stand for three minutes before needing to change positions, and then she can sit for five minutes.  (AR 54.)  According to Gaudette, when she takes pain medication she can sit for five or ten minutes before needing to stand.  (AR 55.)  She testified that she sometimes needs to lie down during the day for the pain and takes a two-hour nap each day in the early morning.  (AR 66.)

Gaudette also testified that in August 2011, she was involved in a motor vehicle accident that caused her right knee to strike the dashboard.  (AR. 55.)  She alleges that this accident resulted in a "hairline fracture on the kneecap."  (*Id*.)  She alleges that ultimately, one of her medical providers took x-rays and discovered "problem[s]" with her right ankle, in addition to the right knee.  (AR 57.)  She also testified that she has carpal tunnel in her wrist which causes numbness and tingling in both hands and is exacerbated by lifting objects around the house.  (AR 67−68.)  Although the record contains medical notes documenting Gaudette received treatment from medical providers for various ailments, it contains no medical opinions prepared by any of these providers.

Gaudette has an adult son with whom she lived during most or all of the alleged disability period.  (AR 64, 275.)  She receives financial support from local churches.  (AR 63.)  On June 29, 2011, less than two weeks after the alleged onset date, she reported that she was spending her days at home, cleaning the house, watching television, talking on the phone with her family once a week, and walking every day for 30 minutes.  (AR 59, 275, 279.)  She also reported that she walked her dog, cooked meals, drove, and shopped for food.  (AR 275, 277, 278, 279.)  She did not report any difficulties with social activities, getting along with authority figures, or following written or spoken instructions.  (AR 279–81.)

In June 2011, Gaudette filed applications for DIB and SSI (AR 192–98, 199–208), alleging a disability onset date of June 18, 2011 (AR 51, 202).  Gaudette's applications were denied initially and upon reconsideration, and she timely requested an administrative hearing.  The hearing was conducted on January 3, 2013 by

Administrative Law Judge ("ALJ") Richard A. Urbin.  (AR 42–75.)  Gaudette testified at the hearing and was represented by an attorney.  A vocational expert also testified.  On March 28, 2013, the ALJ issued a decision finding that Gaudette was not disabled under the Social Security Act from June 18, 2011, her alleged disability onset date, through March 28, 2013, the date of the decision.  (AR 20–36.)  Thereafter, the Appeals Council denied Gaudette's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 3–9.)  Having exhausted her administrative remedies, Gaudette filed a *pro se* Complaint in this action on April 14, 2014.  (Doc. 4.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can

still do despite his or her mental and physical limitations based on all relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Urbin first determined that Gaudette had not engaged in substantial gainful activity since June 18, 2011, the alleged onset date. (AR 26.)  At step two, the ALJ found that Gaudette had the following medically determinable impairments: degenerative changes of the left hip, degenerative joint disease of the right tarsals and possible faint history of fracture of the right fibula, calcaneal osteophytes of the right foot, osteoporosis and osteopenia, asthma, diabetes mellitus, and headaches.  (*Id.*)  Additionally, the ALJ found that, as of January 2013, Gaudette established that her degenerative joint disease and enthesophyte[1] of the right knee were medically determinable impairments.  (*Id.*)  Conversely, the ALJ found that

---

[1] "An enthesophyte is a bony spur forming at a ligament or tendon insertion into bone, growing in the direction of the natural pull of the ligament or tendon involved." *Bradley v. Comm'r of Soc. Sec.*, No. 12 Civ. 7300(ER), 2015 WL 1069307, slip op. at *4, n. 3 (S.D.N.Y. Mar. 11, 2015) (citation omitted).

Gaudette's scoliosis, skin rash, leg cramps, reflux disease, carpal tunnel syndrome, upper

extremity numbness, and adjustment disorder were not medically determinable

impairments.  (AR 26–28.)

Despite the ALJ's determination that Gaudette had the above-listed medically

determinable impairments, the ALJ found that none of them, alone or in combination,

constituted a severe impairment.  (AR 28–35.)  In making this finding, the ALJ

thoroughly considered Gaudette's account of her daily activities, recounting:

> [Gaudette] reports that she cannot get comfortable to sleep.  She does
> housework, albeit with breaks.  She can do housework for about an hour
> before she needs to sit down.  She sits for about five minutes until she has
> spasms, and then she gets up and can work for another hour.  About three
> days a week, she has pain to the point that she cannot do housework at all.
> On those days, she lies on the floor.  She cooks, drives, and goes out alone.
> She socializes with family.  [She] also walks her dog.  She watches
> television. . . .  She feels "worn out" and takes naps twice a day.

(AR 29–30.)  The ALJ also considered Gaudette's statements regarding the severity of

her impairments, including allegations of "sharp and constant" hip pain, "daily spasms"

in her hips, constant back pain for her whole life, swelling in her lower back, and

constant right knee pain.  (AR 30.)  Ultimately, however, the ALJ concluded that

Gaudette had no severe impairment or combination of impairments during the alleged

disability period.  Therefore, the ALJ did not proceed to the next step in the sequential

evaluation process and concluded that Gaudette had not been disabled, as defined in the

Social Security Act, during the relevant period.  (AR 36.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971);

*Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

<u>**Analysis**</u>

Gaudette claims the ALJ "made the decision against [her] for his own reasons," and challenges the ALJ's conclusion that she failed to meet her burden of proof.  (Doc. 17.)  The Commissioner disagrees with Gaudette's claims, asserting that the ALJ's decision complies with the applicable legal standards and is supported by substantial evidence.

**I.     Step-Two Determination**

At step two of the ALJ's sequential analysis, the claimant must demonstrate that she has a "*medically determinable* physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a) (emphasis added).  To be "medically determinable," the impairment must "result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques . . . [and] must be established by medical evidence consisting of signs, symptoms, and laboratory findings . . . ."  20 C.F.R. § 404.1508; *see* SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).  There must be evidence from "acceptable medical sources," including licensed physicians and psychologists, to establish that an impairment is medically determinable.  20 C.F.R. § 404.1513(a).  "If there is no medically determinable . . . impairment[], or if there is a medically

8

determinable . . . impairment[] but the impairment[] could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities."  SSR 96-7p, 1996 WL 374186, at *2.

In addition to demonstrating that she has a medically determinable impairment, the claimant must also show at step two that this impairment or combination of impairments is "severe," meaning it "significantly limit[s] [her] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a); *see* 20 C.F.R. § 404.1520(c).  Despite this strong language, the step-two severity assessment "may do no more than screen out *de minimis* claims."  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (citing *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987)).  To that end, Social Security Ruling ("SSR") 85-28 provides:  "A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., *do not have more than a minimal effect on the [claimant's] physical or mental ability(ies) to perform basic work activities*."  SSR 85-28, 1985 WL 56856, at *3 (1985) (emphasis added).  The Ruling further states:  "[a]n impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made at this step when medical evidence establishes *only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work*."  *Id.* (emphasis added) (citing 20 C.F.R. §§ 404.1520, 404.1521, 416.920(c), 416.921); *see also* SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996).

Here, as noted above, the ALJ concluded that Gaudette's scoliosis, skin rash, leg cramps, reflux disease, carpal tunnel syndrome, upper extremity numbness, and adjustment disorder did not constitute medically determinable impairments during the alleged disability period.  (AR 26–28.)  The ALJ further concluded that, although Gaudette's other impairments were medically determinable, they were not "severe" during the relevant period, given that imaging studies showed only "mild abnormalities" and clinical findings reflected just "mild problems."  (AR 33.)

## A.     Medically Determinable Impairments

Substantial evidence supports the ALJ's conclusion that Gaudette has not met her burden of demonstrating that her scoliosis, carpal tunnel syndrome, and upper extremity numbness are medically determinable impairments.  (AR 26.)[2]  With respect to scoliosis, the ALJ correctly observed that no clinical observations or diagnostic studies support this diagnosis.  (*Id.*)  Instead, the record reflects that Gaudette's treating providers merely recorded her subjective reports that she had a history of scoliosis.  (*See, e.g.*, AR 332.)  Moreover, a June 2011 chest x-ray did not note scoliosis, mentioning only "mild arthritic changes" to the spine.  (AR 328.)  Likewise, regarding Gaudette's carpal tunnel syndrome, the ALJ accurately concluded that the record reflects neither a diagnosis nor treatment for this condition.  (AR 27.)

---

[2]  The ALJ also considered Gaudette's skin rash, leg cramps, "reflux disease," possible thyroid disease, atherosclerotic changes, unwanted weight loss, and affective disorder.  (AR 26–28.)  Gaudette did not allege at the hearing or elsewhere in the record that any of these conditions impaired her ability to perform work activities, nor does she challenge the ALJ's conclusion that these conditions did not rise to the level of a medically determinable impairment.  Thus, the Court need not address them here.

With respect to upper extremity numbness, the ALJ correctly noted that several portions of the medical record were contrary to Gaudette's complaints, including an October 2011 consultative examination performed by Dr. Ryan Clauson which states: "[i]n her elbows she had normal flexion and extension.  In her wrists she had normal flexion and extension, finger opposition and grip strength.  Generally she had no palpable tenderness, no erythema[,] and no muscle spasms."  (AR 369.)  The ALJ also observed that treatment provider notes from June 2012 (AR 501–02) and January 2013 (AR 509–12) indicate that Gaudette denied any numbness, tingling, or wrist pain (AR 369).  Although the ALJ acknowledged that December 2011 treatment notes record that Gaudette complained of hand numbness (*see* AR 27, 405–06), the record contains no evidence of either treatment or clinical signs or symptoms for this condition.

## B.   Severe Impairments

### i.   Asthma, Diabetes, and Migraines

Substantial evidence supports the ALJ's conclusion that Gaudette's asthma, diabetes, and migraine headaches were not severe during the relevant period.  The record contains no evidence indicating how any of these conditions or their symptoms impacted Gaudette's activities of daily living or ability to work.  Regarding her asthma, Gaudette did not include it in her disability application as a condition that prevented her from working (AR 260, 291, 300), and the ALJ properly concluded that the record lacks any evidence to show exacerbation of asthma symptoms other than one emergency room visit for bronchitis.  (AR 32–33 (citing AR 454).)  Furthermore, Gaudette reported using Advair for her asthma "with good results."  (AR 420.)

Regarding Gaudette's diabetes, the ALJ again correctly observed that a June 2011 treatment provider's note described it as "controlled/no complications" (AR 33, 505) and another treatment provider's note later described it as under "great control" in January 2013 (AR 33, 513).  Regarding Gaudette's migraine headaches, the record reveals that she reported to Dr. Clauson that they "have affected her for most of her life all the time[,] but she has been able to function with them."  (AR 370.)  Gaudette reported a worsening of headaches during the period between January 2012 (AR 398) and March 2012 (AR 386), but a treatment provider's note revealed that by October 2012 her prescribed hydrocodone was "working fine for her" (AR 473).  (AR 33.)

### ii.      Osteoarthritis and Right Knee, Right Ankle, and Left Hip Pain

Substantial evidence also supports the ALJ's conclusion that Gaudette's osteoarthritis[3] and knee, ankle, and hip pain were not severe impairments during the alleged disability period.  (AR 31.)  All of the x-ray studies in the record either do not indicate joint degeneration or reflect only "mild" joint degeneration.  (*See* AR 331 ("[m]ild degenerative change" noted on left hip x-ray); AR 397 ("[m]ild degenerative changes within the tarsals" and "possible faint nondisplaced fracture of the extreme tip of the fibula" noted on right ankle x-ray); AR 392 (no soft tissue swelling, "[c]alcaneal osteophytes" and "[n]o acute bony abnormality" noted on follow-up right ankle x-ray); AR 518 ("[n]o acute abnormality," and "mild" degenerative joint disease with "[s]mall-

---

[3] "Osteoarthritis" is a synonym for "degenerative arthritis" or "degenerative joint disease." *Stedman's Medical Dictionary*, 1388 (28th ed. 2006)

moderate sized enthesophyte" noted on right knee x-ray).)  None of the objective medical evidence suggests that Gaudette's osteoarthritis was severe.

The absence of other objective findings also supports the ALJ's conclusion that Gaudette's right ankle and right knee pain were not severe.  On June 20, 2011, Gaudette visited her primary care provider several days after a motor vehicle accident.  (AR 352.) She had swelling and tenderness in her right knee, but her gait and stance were normal. (*Id*.)  Approximately one year later, on June 1 and June 7, 2012, respectively, Gaudette complained of pain radiating from her hip to both sides of her right knee, with no other positive signs or findings.  (AR 501, 520.)  On January 15, 2013, she complained of falling and injuring her right knee (AR 511), but an x-ray showed no sign of fracture and only "mild" joint degeneration and a "[s]mall-moderate sized enthesophyte."  (AR 518.) As to Gaudette's right ankle, despite the presence of calcaneal osteophytes,[4] x-rays showed "[n]o acute bony abnormality" (AR 392), and examinations of her feet were normal by September 2012.  (AR 32 (citing AR 392, 486, 504).)  Dr. Clauson also noted a normal physical examination of her knees and ankles on October 12, 2011.  (AR 369.) Accordingly, substantial evidence supports the conclusion that Gaudette's right knee and right ankle pain were not severe.

Finally, regarding Gaudette's hip and back pain, the only diagnostic study evaluating these concerns is a November 19, 2010 x-ray of Gaudette's left hip.  That procedure revealed no fracture and showed only "[m]ild degenerative change."

---

[4] Osteophytes are "bony spurs" associated with the development of osteoarthritis.  Christine Stewart and Betty Brutman, *4 Attorneys Medical Advisor* § 35:63 (2015).

13

(AR 331.)  At the hearing, Gaudette testified that she has "arthritis in [her] hips" that causes symptoms "[j]ust about all the time" and is exacerbated by lifting, and she experiences symptoms in her back "every day."  (AR 52–53.)  The ALJ acknowledged that Gaudette has complained of low back and hip pain to her primary care providers (AR 32), and the record reflects the same.  (*See* AR 323, 332, 335, 348, 484, 519.)  Nonetheless, when Dr. Clauson, examined Gaudette in October 2011, he observed "normal flexion, extension, abduction[,] and adduction" of her hips; and "no joint space effusion [or] muscle atrophy," and a normal gait.  (AR 369.)  Dr. Clauson also recorded that Gaudette had normal extension, lateral flexion, and rotation.  (AR 370.)  Although he noted that Gaudette was unable to walk on her heels or toes (AR 369) and had tenderness in the lumbar region (AR 370), these are subjective findings, and, as discussed in greater detail below, the ALJ properly discounted Gaudette's credibility with respect to her subjective complaints.

Despite Gaudette's treatment with various medical providers, none of these providers has offered an opinion in support of her claim.  There are, however, several consulting physician opinions in the record, and the ALJ properly relied on these opinions as additional support for his conclusion that Gaudette's impairments were not severe.  (AR 35.)  *See* 20 C.F.R. § 404.1527(e)(2)(i), (ii) ("State agency medical and psychological consultants . . . are highly qualified physicians [and] psychologists . . . who are also experts in Social Security disability evaluation.  Therefore, [ALJs] must consider [their] findings and other opinions . . . as opinion evidence . . . [,] using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical

14

specialty and expertise in our rules, the supporting evidence in the case record,

supporting explanations the medical or psychological consultant provides, and any other

factors relevant to the weighing of the opinions.").  Specifically, Dr. Clauson examined

Gaudette in October 2011 and prepared a report (AR 367−73), which the ALJ mostly

credited, aside from findings regarding scoliosis and asthma that contradicted the medical

evidence in the record or were otherwise based on Gaudette's discredited subjective

complaints.  (AR 35−36.)  Although Dr. Clauson reserved for the ALJ the determination

of whether Ms. Gaudette was disabled within the meaning of the Social Security Act, the

ALJ properly considered the doctor's findings with respect to Gaudette's physical

abilities, most of which were within normal ranges.  The ALJ also relied on the opinions

of two agency medical consultants who, with the benefit of Dr. Clauson's report, agreed

in October and November 2011, respectively, that Gaudette's physical impairments were

not severe.  (AR 35 (citing AR 105, 120).)  Opinions of non-examining medical sources

may be accorded great weight where, as here, those opinions are well supported by the

record.  20 C.F.R. §§ 404.1527(c)(4); 416.927(c)(4) ("Generally, the more consistent an

opinion is with the record as a whole, the more weight we will give to that opinion.");

*see also Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995); *Schisler v. Sullivan*,

3 F.3d 563, 568 (2d Cir. 1993).

The ALJ properly gave little weight to the opinions of agency consultant Dr.

Kevin Whittle, who opined in August 2011 that Gaudette could perform no more than

light work.  (AR 78−87.)  As the ALJ correctly reasoned, Dr. Whittle did not have the

benefit of Dr. Clauson's report nor any of the medical records generated after August

2011 which were submitted into evidence.  (AR 36); *see also* 20 C.F.R.

§§ 404.1527(c)(4); 416.927(c)(4).

In sum, substantial medical evidence supports the ALJ's conclusion that Gaudette

did not have a severe impairment during the relevant period.

## II.      Credibility Determination

The ALJ determined that "[Gaudette's] statements concerning the intensity,

persistence[,] and limiting effects of [her] symptoms . . . are not entirely credible."

(AR 31.)  This credibility determination is supported by substantial evidence.

It is the province of the Commissioner, not the reviewing court, to "'appraise the

credibility of witnesses, including the claimant.'"  *Aponte v. Sec'y of Health & Human

Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (quoting *Carroll v. Sec'y of Health & Human

Servs.*, 705 F.2d 638, 642 (2d Cir. 1982).  When evaluating the credibility of a claimant's

statements, the ALJ "must consider the entire case record and give specific reasons for

the weight given [thereto]."  SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996).  If the

ALJ's findings are supported by substantial evidence, the court must uphold the ALJ's

decision to discount a claimant's subjective complaints, even if substantial evidence

supporting the claimant's position also exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126

(2d Cir. 1990) ("Where there is substantial evidence to support either position, the

determination is one to be made by the factfinder.").  "In consideration of a claimant's

subjective accounts of how her level of pain affects her ability to work, an ALJ will

evaluate the claimant's statements in relation to the objective medical evidence."

*Armstrong v. Comm'r of Soc. Sec.*, No. 1:06-CV-1049-DNH, 2009 WL 2883046, *4

(N.D.N.Y. Sept. 4, 2009). If the claimant's statements about pain are not substantiated by the objective medical evidence, the ALJ must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms. SSR 96-7p, 1996 WL 374186, *4 (July 2, 1996).

In assessing Gaudette's credibility, the ALJ properly compared Gaudette's subjective statements with objective findings recorded in her treatment records. *See* 20 C.F.R. § 404.1529(c)(1) ("[i]n evaluating the intensity and persistence of your symptoms, we consider all of the available evidence, including . . . the signs and laboratory findings"); *id.* at (c)(2) ("Objective medical evidence . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work.").[5] For example, despite Gaudette's complaints of pain due to osteoarthritis, her x-ray reports characterize any joint degeneration as "mild" (AR 31 (citing AR 331, 386, 397)), and her medical providers never referred her for other diagnostic imaging, physical therapy, or specialist care. Furthermore, the ALJ correctly recognized that Gaudette "was almost always, if not always, examined and treated by non-physicians, which level of care is not consistent with a severe impairment." (AR 34.)

With respect to Gaudette's right knee, the ALJ allowed an additional 30 days for Gaudette to supply x-rays supporting her testimony that she had a "hairline fracture on the kneecap." (AR 55.) But the medical records eventually submitted by Gaudette reveal

---

[5] The regulations define medical "signs" as "anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques." 20 C.F.R. § 404.1528(b).

merely that, in January 2013, *approximately two weeks after the administrative hearing*, she visited her primary care provider and reported that she "fell down 2 ½ weeks ago and injured her right knee and wants an x[-]ray." (AR 511.) The resulting x-ray showed no fracture. (AR 518.) The record does not indicate that Gaudette received any further treatment for this alleged injury or that any other evidence exists to indicate the presence of a more serious right knee condition.[6]

The ALJ also noted discrepancies between Gaudette's hearing testimony regarding her impairments and her subjective reports to Dr. Clauson during the October 2011 consultative examination. (AR 33.) For example, Gaudette testified that she cannot lift more than ten pounds; she can sit for only five or ten minutes; and she can stand for only up to one hour. (AR 53, 55.) She told Dr. Clauson, however, that "[s]he can sit for 15–20 minutes at a time. She can stand for a half hour, [and] she can walk one mile before she gets the crampy sensation in her legs. She can lift and carry 15–20 pounds." (AR 368.) The ALJ accurately observed that Gaudette's statement to the orthopedist regarding sitting and lifting represents a "100 percent increase from the abilities she admitted [to] in testimony." (AR 34.)[7]

The ALJ also noted several other instances in which Gaudette misstated the nature of her alleged impairments. (*Id.*) For example, as discussed above, Gaudette claimed at

---

[6] Although Gaudette reported "worsening of existing knee pain" in January of 2013 (AR 32, 511), the ALJ concluded that a second consultative orthopedic evaluation was unnecessary given the absence of diagnostic findings beyond "mild" degeneration. (AR 32.)

[7] Statements made in Gaudette's June 2011 Function Report (AR 280) differ even more significantly from her hearing testimony, further supporting the ALJ's credibility determination. In the Report, Gaudette does not circle "sitting" or "standing" among the items affected by her conditions and reports being able to walk "5 mile[s]" before needing to stop and rest. (*Id.*)

the hearing to have carpal tunnel syndrome (AR 67), but no evidence of diagnosis or treatment for this condition exists in the record.  Gaudette testified that her medical providers "were talking about replacing" her right ankle and right knee (AR 52, 55), but the ALJ correctly observed that "the medical records do not document a referral to a surgeon."  (AR 34.)  The ALJ also correctly stated that, despite Gaudette's testimony about an aspirin allergy and the ineffectiveness of over-the-counter medications to control her pain (AR 58), the medical records reveal that she has been prescribed aspirin and there are no persistent complaints about an allergy, and aspirin was not listed on her allergy list at Siouxland Community Health Center or Avera Sacred Heart Hospital (AR 389, 436, 456, 457, 463).  (AR 34.)  These inconsistencies support the ALJ's conclusion that Gaudette "exaggerates her symptoms."  (*Id.*)  The ALJ also noted that Gaudette "does not have a mental diagnosis that would explain [her inconsistent statements]," and stated: "I considered whether [Gaudette's] limited education and/or possible nervousness during the hearing could account for the inconsistencies, but I conclude that the misrepresentations cannot be reasonably explained by these factors." (*Id.*)

The ALJ also considered Gaudette's use of pain medication relative to her subjective reports of pain.  (AR 30.)  For example, Gaudette testified that she takes hydrocodone and gabapentin for headaches (AR 61, 67) and for "all the pain in [her] body" (AR 58), but that she had not taken any pain medication during the month and a half prior to the hearing (AR 53).  The ALJ considered that Gaudette testified she could not afford her medications, and yet the record indicates that she received assistance from

the Iowa Medication Voucher Program, the Iowa Prescription Assistance Program, and other assistance programs.  (AR 34; *see* AR 490, 511.)

The ALJ also correctly observed that Gaudette's reported activities contradict the severity of her alleged symptoms.  For example, the record demonstrates that Gaudette performed household chores such as cooking, cleaning, and washing dishes; traveled outside "all the time"; walked her dog; and drove.  (AR 275, 277–78.)  It was proper for the ALJ to consider these activities in assessing Gaudette's credibility.  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c); *Poupore v. Astrue* 566 F.3d 303, 307 (2d Cir. 2009) ("the ALJ correctly noted that [the claimant] . . . vacuumed and washed dishes, that he occasionally drove, and that he watched television, read, and used the computer" when evaluating credibility).

In sum, substantial evidence supports the ALJ's credibility determination.

<u>**Conclusion**</u>

For these reasons, I recommend that Gaudette's motion (Doc. 14) be DENIED, the Commissioner's motion (Doc. 19) be GRANTED, and the decision of the Commissioner be AFFIRMED.

Dated at Burlington, in the District of Vermont, this 29th day of July, 2015.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).